IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALDI INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. _____ |
| | ) | |
| INTELLECTUAL VENTURES I LLC; | ) | **JURY TRIAL DEMANDED** |
| INTELLECTUAL VENTURES II LLC; and | ) | |
| OL SECURITY LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff ALDI Inc. ("ALDI") brings this Complaint for Declaratory Judgment against

Defendants Intellectual Ventures I LLC ("IV I"), Intellectual Ventures II LLC ("IV II"), and OL

Security LLC (together, "IV" or "Defendants") and alleges as follows:

### NATURE OF THE ACTION

1.      This is an action for declaratory judgment of non-infringement under the

Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the patent laws of the United States, 35

U.S.C. § 1 *et seq.* ALDI seeks a declaration that it does not infringe any claim of the six patents

that IV has identified in demand letters to ALDI: U.S. Patent Nos. 7,257,582 (the "582 patent"),

7,930,287 (the "287 patent"), 8,332,844 (the "844 patent"), 8,352,584 (the "584 patent"),

9,948,712 (the "712 patent"), and RE48,894 (the "894 patent") (collectively, the "DJ Patents"). IV

has asserted these patents against ALDI based on ALDI's alleged use of widely adopted, third-

party, open-source software, including Apache Spark, Elasticsearch, Docker, Kubernetes, Docker

Swarm, and Apache Kafka. IV has expressly stated that it "does not authorize Aldi or Aldi's

customers or partners to practice any of the above patents and/or other IV patent rights without a

1

license," has noted that its "investigation of [ALDI's] products and services is ongoing," and has invited ALDI to negotiate a license.

2.     ALDI, however, has not and does not infringe any claim of the DJ Patents, and ALDI is not required to pay IV a license fee. An actual, substantial, immediate, and continuing controversy exists because IV, through its outside litigation counsel Kasowitz LLP, sent ALDI a detailed demand letter on March 20, 2026 (attached as Exhibit A) that identifies the DJ Patents, accuses ALDI's use of the listed open-source technologies as "example infringing products," expressly states that IV "does not authorize Aldi or Aldi's customers or partners to practice any of the above patents and/or other IV patent rights without a license," encloses copies of the patents, and invites negotiations for a portfolio license. The March 2026 letter follows prior communications in June 2025 (attached as Exhibit B), and states that IV's "investigation of [ALDI's] products and services is ongoing," further underscoring immediacy and adversity. IV's express instruction that it does not authorize ALDI or ALDI's "customers or partners" to practice the DJ Patents without a license places a cloud over ALDI's relationships with technology vendors and partners, creating present commercial uncertainty and a justiciable controversy. A judicial declaration is necessary and appropriate so that ALDI may ascertain its rights with respect to the DJ Patents.

## THE PARTIES

3.     Plaintiff ALDI Inc. is an Illinois corporation with its principal place of business at 1200 N Kirk Rd., Batavia, Illinois 60510. ALDI operates a chain of limited-assortment grocery stores throughout the United States, offering food, beverages, and household essentials, including a substantial selection of private-label products.

4.      On information and belief, Defendant Intellectual Ventures I LLC is a Delaware limited liability company with a principal place of business at 3150 139th Avenue SE, Bellevue, Washington 98005.

5.      On information and belief, Defendant Intellectual Ventures II LLC is a Delaware limited liability company with a principal place of business at 3150 139th Avenue SE, Bellevue, Washington 98005.

6.      On information and belief, Defendant OL Security LLC is a Delaware limited liability company and a wholly owned subsidiary of Invention Investment Fund II, LLC ("IIF2"), with a principal place of business at 160 Greentree Drive, Suite 101, Dover, Delaware 19904. OL Security LLC is identified in IV's March 20, 2026 letter to ALDI as the assignee of the 287 and 712 patents.

**JURISDICTION AND VENUE**

7.      This action arises under the Declaratory Judgment Act, 28 U.S.C. § 2201, and the patent laws of the United States, 35 U.S.C. § 1 et seq. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

8.      An actual, substantial, immediate, and continuing controversy exists between ALDI and IV regarding the DJ Patents. Among other things and as detailed herein, beginning in June 2025, escalating thereafter, and continuing through at least March 20, 2026, IV has repeatedly targeted ALDI as part of a patent licensing and enforcement campaign, asserting that ALDI was required to obtain a patent license from IV to avoid infringement claims. IV sent ALDI a formal "notice letter" in June 2025 identifying the DJ Patents and accusing ALDI of infringement through use of the same third-party open-source software. On March 20, 2026, IV followed up with a second notice letter from Defendants' outside litigation counsel Kasowitz LLP (attached as Exhibit

3

A), which explicitly states: "IV does not authorize Aldi or Aldi's customers or partners to practice any of the above patents and/or other IV patent rights without a license." Kasowitz has filed over 10 patent infringement lawsuits on behalf of Defendants' relating to one or more of the DJ patents. The March 2026 letter also notes that the identified patents and products are "offered as a list of example patents and example infringing products" and that "IV's investigation of [ALDI's] products and services is ongoing." ALDI, however, has not and does not infringe any of the DJ Patents, and ALDI is not required to pay IV for a license.

9.    This Court has personal jurisdiction over each Defendant under the laws of this State and consistent with the underlying due process principles of the United States Constitution, including because each Defendant is incorporated in, does business in, or has otherwise purposefully availed itself of the laws of the State of Delaware.

10.    This Court has personal jurisdiction over IV I under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV I is also subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

11.    This Court has personal jurisdiction over IV II under the laws of this State and consistent with the underlying due process principles of the United States Constitution. IV II is also subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

12.    This Court has personal jurisdiction over OL Security LLC under the laws of this State and consistent with the underlying due process principles of the United States Constitution. OL Security LLC is also subject to general personal jurisdiction in Delaware because it was formed under the laws of the State of Delaware.

13.     The IV entities have repeatedly litigated patent disputes in this District, both as plaintiffs and as defendants in declaratory judgment actions, further confirming their purposeful availment of Delaware and this Court. *See, e.g.*, *Intellectual Ventures I LLC v. Ubiquiti, Inc.*, No. 23-865 (D. Del.) (filed Aug. 8, 2023); *Intellectual Ventures I LLC v. Extreme Networks, Inc.*, No. 23-489 (D. Del.) (filed May 4, 2023); *Intellectual Ventures I LLC v. Symantec Corp.*, No. 13-440 (D. Del.) (filed Mar. 18, 2013); *Intellectual Ventures I LLC v. Symantec Corp.*, No. 10-1067 (D. Del.) (filed Dec. 8, 2010); *Intellectual Ventures I LLC v. Trend Micro Inc.*, No. 12-1581 (D. Del.) (filed Nov. 21, 2012); *Intellectual Ventures I LLC v. Canon Inc.*, No. 11-792 (D. Del.) (filed Sept. 9, 2011); *Intellectual Ventures II LLC v. Canon Inc.*, Nos. 15-446, 15-447 (D. Del.) (filed June 2, 2015); *Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, Nos. 13-1632, 13-1671, 15-800 (D. Del.) (filed Oct. 1, 2013; Oct. 7, 2013; Sept. 9, 2015); *Intellectual Ventures I LLC v. Nextel Operations Inc.*, Nos. 13-1634, 13-1652, 13-1670 (D. Del.) (filed Oct. 1, 2013; Oct. 4, 2013; Oct. 7, 2013); and *Intellectual Ventures I LLC v. United States Cellular Corp.*, Nos. 13-1636, 13-1672 (D. Del.) (filed Oct. 1, 2013; Oct. 7, 2013). On information and belief, the IV entities also have entered into licensing agreements for the use of their patents in Delaware, and they have each sent other cease-and-desist letters into the forum to other entities regarding their patents.

14.     ALDI further understands, and alleges upon information and belief, that IV is currently and actively seeking license payments from or otherwise asserting the DJ Patents against additional parties that IV has not yet sued, but accuses of infringing the DJ Patents through use of the same software. IV's ongoing assertion campaign further confirms the existence of a live, immediate, and continuing controversy.

15.     Venue is proper in this judicial district under at least 28 U.S.C. § 1391(b)–(c) because each Defendant is a resident of, incorporated in, or subject to personal jurisdiction in this

District. Multiple declaratory judgment actions by similarly situated companies have recently been filed in this District against IV entities on overlapping subject matter and theories, underscoring Delaware's centrality to disputes of this type. *See, e.g.*, *The Travelers Indemnity Co. v. Intellectual Ventures I LLC*, No. 26-397 (D. Del.) (filed Apr. 8, 2026); *Hartford Fire Insurance Co. v. Intellectual Ventures I LLC*, No. 26-392 (D. Del.) (filed Apr. 7, 2026); *Anuvu Corp. v. Intellectual Ventures I LLC*, No. 25-124 (D. Del.) (filed Jan. 30, 2025); *Viasat, Inc. v. Intellectual Ventures I LLC*, No. 25-56 (D. Del.) (filed Jan. 14, 2025); and *Assurant, Inc. v. Intellectual Ventures I LLC*, No. 24-344 (D. Del.) (filed Mar. 15, 2024).

## THE DJ PATENTS

16.    IV II alleges it is the owner or assignee of the 844 and 584 patents. *See, e.g.*, Ex. A (IV March 20, 2026 Notice Letter to ALDI). As noted previously, the 844 and 584 patents are attached hereto.

17.    IV I alleges it is the owner or assignee of the 582 and 894 patents. *See, e.g.*, Ex. A (IV March 20, 2026 Notice Letter to ALDI). As noted previously, the 582 and 894 patents are attached hereto.

18.    IV alleges that OL Security LLC is a wholly owned subsidiary of IIF2 and that OL Security LLC is the assignee of the 287 and 712 patents. *See, e.g.*, Ex. A (IV March 20, 2026 Notice Letter to ALDI). As noted previously, the 287 and 712 patents are attached hereto.

## FACTUAL BACKGROUND

19.    IV is in the business of monetizing patents, including through licensing campaigns and by filing patent litigations. IV's typical approach includes engaging in licensing campaigns targeting a given set of companies, repeatedly contacting target companies, attempting to negotiate licenses with companies that respond, and filing—and aggressively pursuing—patent litigation

against companies that decline to engage or pay IV to license IV's patents. This strategy is designed to apply sustained pressure, to use litigation as leverage, and to extract portfolio-level license fees irrespective of whether the asserted patents are actually infringed, valid, or enforceable.

20.     IV's monetization model is not tied to any good-faith infringement analysis. IV's "Retail & eCommerce Licensing Program Pricing" materials reveal that IV offers a default "portfolio-wide perpetual nonexclusive, worldwide license to all patents IIF has the right to license" and prices this package using a "systematic approach" keyed solely to licensee U.S. revenue—not to accused products, claim scope, or actual infringement. IV's pricing "tiers are based on the most recently disclosed U.S. revenue for each IIF licensing customer," ranging from $1.0 million for companies under $5 billion in revenue to $13.5 million for companies above $100 billion, as a "one-time payment." This revenue-only tariff is structurally indifferent to whether a target practices any asserted claim, how much of the accused functionality it uses, or whether the asserted patents are valid or enforceable.

21.     IV's Licensing Program materials confirm that its default product is a portfolio-wide package, not a license tailored to the handful of patents it accuses a target of infringing. The program states that "[u]pon request, IIF will also consider offers to license (or purchase) selected patents from its portfolio," framing per-patent licensing as a discretionary exception rather than the standard pathway. The practical effect is to condition resolution on acceptance of a broad portfolio license priced by company size, irrespective of the narrow dispute IV's notice letters purport to create. This portfolio-bundling approach is coercive because it forces targets to pay for far more than the patents at issue to obtain peace from IV's threats.

22.     IV markets its licensing campaign with an explicit enforcement drumbeat. The Licensing Program materials state that "IIF seeks to enforce its patent rights" and lists pending patent litigations against The Home Depot, Nationwide Mutual Insurance, The Bank of New York Mellon, American Airlines, Lenovo, and Tesla, while noting settlements with JPMorgan Chase, Liberty Mutual, and Comerica and stating that "further actions [are] planned." By positioning ongoing and future lawsuits as a core component of its licensing pitch, IV uses the threat and cost of litigation to maximize pressure and coerce portfolio-level payments.

23.     IV's program is not directed at specific infringers but targets an entire industry. The Licensing Program materials state that "IIF is offering licenses to all retail and eCommerce companies with business operations in the United States." This industry-wide outreach demonstrates that IV's campaign is a systematic monetization effort designed to extract payments from companies based on their market presence and revenue, not based on any individualized assessment of infringement. ALDI is among the retail companies targeted by this campaign.

24.     The Licensing Program materials bear a copyright notice identifying "Intellectual Ventures Management, LLC (IV)" as the author, despite being branded as an Invention Investment Fund offering. On information and belief, Intellectual Ventures Management, LLC prepared, directed, and supervised the Retail & eCommerce Licensing Program, and the named Defendants and their affiliates, including IIF entities and OL Security LLC, act in concert and under common control in designing, marketing, and executing the licensing and enforcement campaign alleged herein.

25.     The DJ Patents identified in IV's March 20, 2026 letter to ALDI are asserted based on ALDI's alleged use of common, third-party, open-source software platforms. IV's letter includes a table identifying each patent, its assignee, an "example claim," and the corresponding

"example product/feature." The 582 patent (assigned to IV I) is asserted against Apache Spark, with Claim 1 identified as the example claim; the 287 patent (assigned to OL Security LLC) is asserted against Elasticsearch, with Claim 28 identified as the example claim; the 844 patent (assigned to IV II) is asserted against Docker, with Claim 7 identified as the example claim; the 584 patent (assigned to IV II) is asserted against Kubernetes, with Claim 1 identified as the example claim; the 712 patent (assigned to OL Security LLC) is asserted against Docker Swarm, with Claim 16 identified as the example claim; and the 894 patent (assigned to IV I) is asserted against Apache Kafka, with Claim 15 identified as the example claim.

26.    IV's March 20, 2026 letter explicitly states that "IV does not authorize Aldi or Aldi's customers or partners to practice any of the above patents and/or other IV patent rights without a license," encloses copies of each of the six identified patents, and requests that ALDI engage in licensing discussions either "to the specifically referenced patents or to all or a subset of the IV patent rights." A true and correct copy of IV's March 20, 2026 letter is attached as Exhibit A.

27.    IV's conduct toward ALDI mirrors a broader, ongoing licensing and litigation campaign against companies for their alleged use of the same third-party, open-source software products IV accuses here. Public pleadings show that IV has filed multiple waves of suits asserting subsets of the DJ Patents against identical accused platforms—Docker, Kubernetes, Apache Kafka, and Apache Spark—and often has prefaced those suits with near-identical Kasowitz "formal notice letters" listing the same patents and accused third-party software that appear in ALDI's March 2026 notice.

28.    In November 2023, IV filed actions against JPMorgan Chase, Comerica, and Liberty Mutual in the Eastern District of Texas, pairing the 844 patent with Docker, U.S. Patent

No. 7,949,785 with Kubernetes, U.S. Patent No. 8,407,722 with Kafka, and U.S. Patent No. 7,712,080 with Spark. In November 2024, IV sued American Airlines and Southwest Airlines using the same patent-to-product pairings and adding the 582 patent against Spark and the 584 patent against Kubernetes. In March 2025, IV sued Bank of New York Mellon and Nationwide in the Northern District of Texas; in July 2025, IV sued The Home Depot in the Western District of Texas; in February 2026, IV sued Deere in the Western District of Texas; and in March 2026, IV sued GEICO in the Northern District of Texas—again asserting overlapping subsets of the same patents against the same third-party platforms.

29.     IV's infringement theories in those cases are anchored in the off-the-shelf behavior of the third-party software, not in defendant-specific implementations. In several cases, IV filed claim charts mapping the asserted patents to alleged features of Docker, Kubernetes, Kafka, and Spark, which other declaratory-judgment plaintiffs have attached to their complaints to show that IV's accusations target the software's native functionality rather than any customization unique to the defendant. IV's own claim charts attempt to map claim elements to the standard, out-of-the-box behaviors of these third-party platforms, illustrating that IV's theories do not depend on any defendant-specific implementation.

30.     IV's pre-suit practice is uniform. Like the letters ALDI received on June 5, 2025 and March 20, 2026, IV's "formal notice letters" to other targets identify lists of "example patents" and "example infringing products," state that IV's "investigation" is ongoing, and declare that IV "does not authorize [the company] or [its] customers or partners to practice" the listed patents "without a license," while inviting discussions for a portfolio license. IV's Retail & eCommerce Licensing Program materials state that IV "seeks to enforce its patent rights" and that "further actions [are] planned."

31.     In 2025, IV presented revenue-tiered portfolio-license pricing sheets to industry targets as part of this campaign, proposing one-time fees scaled to U.S. revenue and citing pending and newly filed suits as part of its enforcement narrative. In retail and eCommerce, IV offered a one-time, portfolio-wide license priced by U.S. revenue, ranging from $1.0 million for companies under $5 billion in revenue to $13.5 million for companies above $100 billion, while stating it "seeks to enforce its patent rights" and citing pending and settled litigations with "further actions planned." A true and correct copy of IV's "Invention Investment Fund (IIF) Retail & eCommerce Licensing Program Pricing" is attached as Exhibit C.

32.     IV, through Kasowitz LLP, sent ALDI a demand letter dated March 20, 2026 (attached as Exhibit A), identifying the DJ Patents, listing ALDI's use of Apache Spark, Elasticsearch, Docker, Kubernetes, Docker Swarm, and Apache Kafka as "example" accused products, and asserting that IV's investigation of ALDI is ongoing. The March 2026 letter states: "Aldi has already received communications pertaining to the above patents/technologies, which are offered as a list of example patents and example infringing products (IV's investigation of Aldi's products and services is ongoing)." The letter followed IV's prior outreach to ALDI in or around June 2025 (attached as Exhibit B).

33.     The March 20, 2026 letter explicitly states that "IV does not authorize Aldi or Aldi's customers or partners to practice any of the above patents and/or other IV patent rights without a license," encloses copies of the six patents, and invites negotiations concerning a license to the listed patents or a broader subset of IV's portfolio. IV's statement that it does not authorize ALDI's "customers or partners" to practice the patents demonstrates that IV's assertion extends beyond ALDI itself and creates uncertainty for ALDI's business relationships. When paired with IV's industry-wide outreach to "all retail and eCommerce companies" as stated in its Licensing

11

Program materials, the "no authorization" language operates as a coordinated effort to reach and unsettle ALDI's vendors, technology partners, and business relationships across its commercial ecosystem.

34.    IV's March 2026 demand letter to ALDI is consistent with IV's broader strategy of monetizing patents through coordinated licensing and litigation campaigns focused on open-source software used by numerous companies. IV's demand that ALDI negotiate a license to "all or a subset of the IV patent rights" reflects the portfolio-bundling approach documented in IV's Licensing Program materials, which offer a default "portfolio-wide perpetual nonexclusive, worldwide license" priced solely by U.S. revenue. The worldwide scope of IV's proposed license far exceeds the domestic controversy created by IV's notice letters regarding six U.S. patents, further evidencing that IV's demands are designed to coerce settlement through portfolio breadth rather than to resolve any good-faith infringement dispute.

35.    IV's conduct warrants a finding that this is an exceptional case under 35 U.S.C. § 285. IV's infringement theories target the off-the-shelf behavior of third-party open-source platforms, not any defendant-specific implementation; IV's Licensing Program prices its demands solely by licensee U.S. revenue without any nexus to the accused functionality, claim scope, or merits of infringement; and IV markets its licensing campaign with references to pending and planned litigations as leverage. Taken together, these facts demonstrate that IV's assertion against ALDI is part of a revenue-extraction campaign untethered to any good-faith infringement analysis, and ALDI is entitled to recover its attorney fees and costs if IV persists in its unfounded accusations.

36.    ALDI denies that it infringes any claim of the DJ Patents under any theory of liability, and brings this action to resolve the concrete dispute created by IV's letters and conduct.

12

## COUNT I: DECLARATION OF NON-INFRINGEMENT OF
## U.S. PATENT NO. 8,332,844 (Docker)

37.    ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

38.    The 844 patent (attached as Exhibit D) is titled "Root Image Caching and Indexing for Block-Level Distributed Application Management." Its abstract describes storing blocks of a root image and leaf images, where leaf images include additional data blocks not previously contained in the root image and changes made by respective compute nodes, and caching blocks of the root image accessed by compute nodes.

39.    IV has asserted the 844 patent against third-party software known as "Docker" based on similar theories across its campaign; IV's March 20, 2026 letter to ALDI identifies Docker as the accused platform.

40.    ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 844 patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Docker, at least because Docker does not employ, incorporate, use, or otherwise include all of the limitations of the 844 patent's claims. ALDI does not design, make, sell, offer to sell, or import Docker; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 7 as the "example claim" for the 844 patent. Although there are additional reasons why ALDI and Docker do not infringe the 844 patent, non-limiting examples are discussed below.

41.    Claim 7 of the 844 patent recites: "A method for providing data to a plurality of compute nodes, comprising: storing blocks of a root image of said compute nodes on a first storage

13

unit; storing leaf images for respective compute nodes on respective second storage units, said leaf images including only additional data blocks not previously contained in said root image and changes made by respective compute nodes to the blocks of the root image, wherein said leaf images of respective compute nodes do not include blocks of said root image that are unchanged by respective compute nodes; and caching blocks of said root image that have been accessed by at least one of said compute nodes in a cache memory."

42.     The 844 patent is directed to block-level distributed application management—an architecture that stores, modifies, and caches discrete data blocks at the storage layer, below the file system. Docker operates at the file system layer using union file systems and does not perform block-level storage operations of the type the patent claims. This fundamental architectural mismatch between the patent's block-level design and Docker's file-system-layer architecture is independently sufficient to defeat infringement of every element of Claim 7.

43.     One or more additional limitations of Claim 7 are absent. Docker containers are processes that share the host machine's processor and memory rather than discrete "compute nodes" each having dedicated processors and memory as the patent claims. Docker's storage architecture does not provide a distinct "first storage unit" for the root image and "respective second storage units" for each compute node's leaf image—all image and container layers reside in the same unified local storage area managed by the same storage driver on the same host. Docker's copy-on-write mechanism operates at the file level rather than the block level, copying entire files into the container's writable layer rather than only the modified data blocks the patent requires, with the result that the container layer contains data previously contained in the image layers and does not consist of "only additional data blocks not previously contained in said root image." And Docker has no runtime block-level cache memory that caches root image blocks

14

accessed by compute nodes—Docker's build-time layer cache is a build optimization unrelated to runtime compute node access, and any incidental OS-level file caching is generic host behavior independent of Docker's architecture. These and other missing limitations each independently defeat any theory of infringement.

44.     At least because of the absences discussed above, ALDI does not directly infringe the 844 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 844 patent, including no induced or contributory infringement of the 844 patent.

45.     Absent a declaratory judgment, IV will continue to wrongfully allege that ALDI infringes the 844 patent, causing harm and uncertainty to ALDI's business.

46.     An actual, substantial, immediate, and continuing controversy exists regarding the 844 patent, and ALDI seeks a judicial declaration under 28 U.S.C. § 2201 that it does not infringe.

## COUNT II: DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 8,352,584 (Kubernetes)

47.     ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

48.     The 584 patent (attached as Exhibit E) is titled "System for Hosting Customized Computing Clusters," and its abstract describes a hosting system that includes customized clusters, per-node and per-cluster monitoring, and gateway mechanisms isolating cluster communications.

49.     IV's March 20, 2026 letter to ALDI identifies Kubernetes as the accused third-party platform for the 584 patent.

50.     ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 584 patent, including

15

through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Kubernetes, at least because Kubernetes does not employ, incorporate, use, or otherwise include all of the limitations of the 584 patent's claims. ALDI does not design, make, sell, offer to sell, or import Kubernetes; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 1 as the "example claim" for the 584 patent. Although there are additional reasons why ALDI and Kubernetes do not infringe the 584 patent, non-limiting examples are discussed below.

51.    Claim 1 of the 584 patent recites: "A computer system, comprising: a private communications network linked to a public communication network; a first cluster comprising a set of computing resources, including at least one hardware processor, in a first configuration, wherein the first cluster is communicatively linked to the private communications network; a second cluster comprising a set of computing resources, including at least one hardware processor, in a second configuration, wherein the second cluster is communicatively linked to the private communications network; and a monitoring system to monitor operations of the first cluster and the second cluster for communications problems; wherein the first configuration differs from the second configuration; wherein the first configuration provides a first computing environment to perform a first client task and the second configuration provides a second computing environment to perform a second client task; and wherein the computing resources comprise processing nodes, data storage shared by the processing nodes, and at least one communications network to link the processing nodes to each other and to the data storage; wherein the first cluster establishes communications between the set of computing resources of the first cluster and a first gateway communicatively linked between the first cluster and the private communications network;

wherein the second cluster establishes communications among the set of computing resources of the second cluster and a second gateway communicatively linked between the second cluster and the private communications network; wherein communications between the first cluster and the second cluster are isolated; wherein the first cluster is a high performance cluster; and wherein the second cluster is a high performance cluster."

52.    The prosecution history of the 584 patent informs the understanding of Claim 1's "at least one hardware processor" limitation. The 584 patent is a continuation of application No. 11/927,921 ("the 921 parent application"), which was filed on October 30, 2007 and issued as U.S. Patent No. 7,822,841 ("the 841 patent"), entitled "Method and system for hosting multiple, customized computing clusters." The "at least one hardware processor" limitation of Claim 1 of the 584 patent is also found in and derives from the 841 patent, of which the 584 patent was a continuation.

53.    During prosecution of the 841 patent, the examiner rejected the patentee's claims specifically because they did "not contain components that are limited to hardware."

54.    The patentee amended the claims to add "hardware processor."

55.    The claims were allowed over the prior art as a result of patentee's amendment to add this "at least one hardware processor" limitation, expressly disclaiming in the process any software or virtualized processor as being able to meet this particular element of the claim. *See, e.g.*, *In re McDonald*, 43 F.4th 1340, 1347 (Fed. Cir. 2022) (claim amended to overcome 101 rejection by adding "processor" limitation cannot be broadened during reissue to recapture surrendered "no processor" subject matter); *Lighthouse Consulting Grp., LLC v. BB&T Corp.*, 476 F. Supp. 3d 532, 543-44 (W.D. Tex. 2020) (granting motion to dismiss and finding claim term "carrier" in a check processing patent construed to be limited to "physical object" (e.g., sheet of

17

paper to which the check is attached) cannot be expanded to capture mobile banking application software).

56.    Claim 1 is a system claim requiring a "computer system" comprising specific hardware components. Kubernetes is software—an open-source container orchestration platform—and is not itself a "computer system" comprising the hardware elements Claim 1 requires. IV's theory necessarily conflates Kubernetes software with the hardware infrastructure on which it runs, but Kubernetes does not provide, constitute, or define any of the hardware components the claim recites.

57.    One or more limitations of Claim 1 are absent. Kubernetes does not meet the "at least one hardware processor" limitation as properly construed in light of the prosecution history described above. Kubernetes is a software orchestration platform that itself supplies no processor of any kind. It runs on whatever infrastructure the operator provides and has no dependence on, awareness of, or requirement for physical hardware processors as opposed to virtualized ones. Because prosecution history estoppel prevents the patentee from recapturing the virtualized and software-based processor subject matter it surrendered to obtain allowance, Kubernetes cannot satisfy this limitation regardless of the infrastructure on which it is deployed. Kubernetes also does not constitute a multi-cluster hosting system with a first and second cluster whose communications with each other are isolated—Kubernetes manages a single cluster under a single control plane and does not itself provision, define, or enforce the isolation between multiple clusters that Claim 1 requires. Kubernetes does not provide dedicated per-cluster gateways linking clusters to a private communications network—any such gateway functionality in a Kubernetes deployment is supplied by external network infrastructure that exists independently of Kubernetes itself. Kubernetes does not itself provide or constitute the shared data storage Claim 1 requires — storage

18

is managed through external systems that Kubernetes accesses through volume abstractions but does not supply. And Kubernetes is a general-purpose container orchestration platform that does not constitute the "high performance cluster" the claim requires in either its first or second cluster element. These and other missing limitations each independently defeat any theory of infringement.

58.     At least because of the absences discussed above, ALDI does not directly infringe the 584 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 584 patent, including no induced or contributory infringement of the 584 patent.

59.     Absent a declaratory judgment, IV will continue to wrongfully allege infringement of the 584 patent to pressure ALDI to license.

60.     An actual, substantial, immediate, and continuing controversy exists as to the 584 patent; ALDI seeks a declaration of non-infringement.

### COUNT III: DECLARATION OF NON-INFRINGEMENT
### OF U.S. PATENT NO. 7,257,582 (Apache Spark)

61.     ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

62.     The 582 patent (attached as Exhibit F) is titled "Load Balancing With Shared Data." Its abstract states, among other things, that input is logically subdivided into partitions distributed to processors, subtasks read and process partitions, and processing is repeated in a "first-come/first-served" manner until all partitions are processed.

63.     IV's March 20, 2026 letter to ALDI identifies Apache Spark (including PySpark) as the accused third-party platform for the 582 patent.

19

64.     ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 582 patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Apache Spark, at least because Apache Spark does not employ, incorporate, use, or otherwise include all of the limitations of the 582 patent's claims. ALDI does not design, make, sell, offer to sell, or import Apache Spark; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 1 as the "example claim" for the 582 patent. Although there are additional reasons why ALDI and Apache Spark do not infringe the 582 patent, non-limiting examples are discussed below.

65.     Claim 1 of the 582 patent recites: "A method of effecting on a preexisting input file a computer-executable process comprised of a plurality of subtasks, the method comprising the steps of: (a) automatically determining file allocation and logically subdividing records of said input file into a plurality of partitions; (b) distributing descriptions of all of said partitions to each of a plurality of subtask processors; (c) simultaneously executing at least a respective one of the subtasks . . . on a respective one of the partitions . . . and; (d) thereafter repeating step (c) in at least some of the subtask processors each with another unprocessed partition on a first-come/first-served basis; and (e) generating at least one output combining all of the subtask outputs."

66.     The prosecution history of the 582 patent defines the claimed invention through a precise architectural distinction. To obtain allowance over prior art that used centralized schedulers, the applicant characterized the claimed system as a "four-way stop"—processors that self-direct and self-allocate work from a shared pool without a central controller—and expressly

disclaimed systems operating like a "traffic light"—a central controller that collects information about available work and directs each processor when to proceed and what to process. That disclaimer runs through every limitation of Claim 1 and forecloses any reading of the claim that encompasses centrally directed task assignment. Apache Spark is the traffic light the applicant disclaimed: every significant architectural feature of Spark—a central driver that maintains state about all pending tasks, collects resource offers from executors, evaluates data locality, and assigns specific tasks to specific executors on demand—is the architecture the applicant surrendered to obtain the patent.

67.    One or more limitations of Claim 1 are absent. Spark does not perform step (a)'s application-level partitioning step. The patent requires a discrete preparatory step in which the initiating system inspects file allocation metadata and logically subdivides records of the input file into partitions—generating a concrete specification of partition boundaries used by all subsequent processors. Spark has no such step. Spark's partitioning is a storage-layer function driven by the underlying file system: for HDFS files, Spark inherits one partition per storage block as defined by the storage layer, without any application-level inspection of file allocation metadata or generation of a partition boundary specification. Spark also does not perform step (b)'s requirement of distributing "descriptions of all of said partitions to each of a plurality of subtask processors." The applicant specifically added this limitation during prosecution and tied it directly to the four-way-stop model: the upfront broadcast of a complete partition map to every processor is what enables self-allocation from a shared pool without a supervisor directing traffic. Spark does the structural opposite—the driver's task scheduler dispatches one task at a time to one executor at a time as executors report available capacity, and each executor receives only its immediate next assignment, never descriptions of all partitions. The full partition map exists only within the

driver's internal scheduling data structures—precisely where the disclaimed special control process resides. Spark also does not perform step (d)'s first-come/first-served self-allocation requirement. The applicant's prosecution history disclaimer defines step (d) as a model in which individual processors independently determine when to take the next available partition from the shared pool, with load balancing occurring as a byproduct of that self-allocation rather than through any central direction. Spark's architecture is the direct inversion: when an executor completes a task, it notifies the driver, which then evaluates available tasks against data locality preferences, executor state, and scheduling policy, and assigns the next task to that executor. Spark executors do not self-select work; they receive assignments from the driver. To the extent IV argues that Spark uses FIFO scheduling, Spark's FIFO mode governs the order in which entire jobs receive cluster resources—not the order in which individual processors claim partitions within a job. Those are categorically different concepts, and the latter is what Claim 1 requires. These and other missing limitations each independently defeat any theory of infringement, and prosecution history estoppel forecloses any argument that Spark's centrally directed architecture falls within the scope of what the applicant claimed.

68.     At least because of the absences discussed above, ALDI does not directly infringe the 582 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 582 patent, including no induced or contributory infringement of the 582 patent.

69.     Absent a declaratory judgment, IV will continue to wrongfully allege that ALDI infringes the 582 patent.

70.     An actual, substantial, immediate, and continuing controversy exists regarding the 582 patent; ALDI seeks a declaration of non-infringement.

## COUNT IV: DECLARATION OF NON-INFRINGEMENT
## OF U.S. PATENT NO. RE48,894 (Apache Kafka)

71. ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

72. The 894 patent (attached as Exhibit G) is titled "Disaggregated Resources and Access Methods," and claims, inter alia, "determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names."

73. IV's March 20, 2026 letter to ALDI identifies Apache Kafka as the accused third-party platform for the 894 patent.

74. ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 894 patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Apache Kafka, at least because Apache Kafka does not employ, incorporate, use, or otherwise include all of the limitations of the 894 patent's claims. ALDI does not design, make, sell, offer to sell, or import Apache Kafka; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 15 as the "example claim" for the 894 patent. Although there are additional reasons why ALDI and Apache Kafka do not infringe the 894 patent, non-limiting examples are discussed below.

75. Independent Claim 8 and dependent Claim 15 of the 894 patent together recite: "8. A method, comprising: receiving, at a resource consumer device, node names corresponding to each of a plurality of resource nodes; determining, using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names, the

organizational structure being a parallel structure that enables access to a data set through at least two of the plurality of resource nodes or a serial structure that enables access to a first data block of the data set through a first resource node and to a second data block consecutive to the first data block of the data set through a second resource node; and generating, using the resource consumer device, a resource map based at least in part on the organizational structure; and messaging, by the resource consumer device, one or more resource nodes of the plurality of resource nodes about the data set based at least in part on the resource map. … 15. The method of claim 8, wherein the received node names are configured to indicate a group type associated with the plurality of resource nodes."

76. The 894 patent's claimed architecture is directed to a disaggregated resource system in which resource nodes possess only incomplete information about the complete disaggregated resource, and resource consumers collect node names from individual nodes and use those names—which are themselves structured to encode organizational topology—to independently determine the organizational structure of the resource and generate a resource map for accessing it. The patent's specification illustrates this with storage systems in which node names like "Z.M1.R1" and "Z.M1.R2" encode mirror group and stripe group membership directly in the name, allowing a consumer to determine from the names alone whether the resource is arranged in parallel or serial structures for data access. Kafka's architecture has no analog to this model— Kafka broker names are opaque administrative identifiers that encode no organizational topology, and Kafka clients learn cluster structure from metadata responses, not from the names of the brokers.

77. The organizational structures Claim 8 specifically requires—a parallel structure enabling simultaneous access to a data set through multiple nodes, or a serial structure enabling

24

access to consecutive data blocks through consecutive nodes—are storage architecture concepts describing how data is physically distributed across nodes, analogous to RAID mirroring, striping, or spanning. Kafka is a distributed publish-subscribe messaging system, not a storage resource system of this type. Kafka's architecture—topics, partitions, leaders, and followers—has no parallel or serial data-block access structure of the kind Claim 8 requires. Each Kafka partition is an ordered, immutable log served exclusively by a single leader broker; follower brokers replicate the leader for fault tolerance but do not serve client requests. Kafka clients access each partition through the single broker serving as that partition's leader—not through multiple nodes simultaneously as a parallel access structure requires, and not through consecutive nodes in a serial chain. The leader/follower arrangement is a replication scheme for fault tolerance, not a parallel or serial data access structure of the type Claim 8 requires.

78. One or more additional limitations of Claims 8 and 15 are independently absent. Kafka clients do not "determin[e], using the resource consumer device, an organizational structure of the plurality of resource nodes based on the received node names" as Claim 8 requires. Kafka's own documentation explains: "How can the client find out which topics exist, what partitions they have, and which brokers currently host those partitions so that it can direct its requests to the right hosts? This information is dynamic, so you can't just configure each client with some static mapping file. Instead all Kafka brokers can answer a metadata request that describes the current state of the cluster: what topics there are, which partitions those topics have, which broker is the leader for those partitions, and the host and port information for these brokers. ... The client does not need to keep polling to see if the cluster has changed; it can fetch metadata once when it is instantiated [and] cache that metadata until it receives an error indicating that the metadata is out of date." Kafka uses a two-phase discovery mechanism—a bootstrap connection phase followed

by a metadata discovery phase—in which the client learns full cluster topology from a metadata response describing current cluster state, not by determining organizational structure from the names of the brokers. Kafka broker identifiers are opaque administrative labels—integer IDs or hostnames—that carry no structural information about cluster topology, partition assignments, leadership roles, or group membership, and no Kafka client determines anything about cluster organizational structure from broker names alone. Claim 15's requirement that node names be "configured to indicate a group type" is likewise absent—Kafka broker names are arbitrary administrative identifiers assigned without any required structural meaning and indicate nothing about group type, partition assignments, or leadership roles. These and other missing limitations each independently defeat any theory of infringement.

79.    At least because of the absences discussed above, ALDI does not directly infringe the 894 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 894 patent, including no induced or contributory infringement of the 894 patent.

80.    Absent a declaratory judgment, IV will continue to wrongfully allege that ALDI infringes the 894 patent.

81.    An actual, substantial, immediate, and continuing controversy exists regarding the 894 patent; ALDI seeks a declaration of non-infringement.

### COUNT V: DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,930,287 (Elasticsearch)

82.    ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

83.    The 287 patent (attached as Exhibit H) is titled "Systems and Methods for Compound Searching," and its abstract describes, among other things, a network-connected search

service presenting an interactive interface, iteratively clarifying a search purpose, and interacting to refine terms.

84.    IV's March 20, 2026 letter to ALDI identifies Elasticsearch as the accused third-party platform for the 287 patent.

85.    ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 287 patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Elasticsearch, at least because Elasticsearch does not employ, incorporate, or otherwise make use of all of the limitations of the 287 patent's claims. ALDI does not design, make, sell, offer to sell, or import Elasticsearch; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 28 as the "example claim" for the 287 patent. Although there are additional reasons why ALDI and Elasticsearch do not infringe any claim of the 287 patent, several non-limiting examples are discussed below.

86.    Claim 28 recites: "A system, comprising: a network interface configured to connect to a network-coupled server that provides a search service display hardware configured to present an interactive interface that is supplied by the search service, wherein the interactive interface is configured to iteratively collect input including at least one term related to a description of a search to refine a purpose for the search and further configured to request and receive at least one first clarification related to the at least one term, and to send the at least one first clarification to the search service and further configured to, in response to receiving the first clarification, request and

receive at least one second clarification related to the at least one term, and to send the second clarification to the search service."

87.      Claim 28 is a system claim that requires, as a hardware component, "display hardware configured to present an interactive interface that is supplied by the search service." Elasticsearch is server-side software accessed entirely through HTTP REST APIs—it has no display hardware component and supplies no user-facing interactive interface of any kind. Documentation consistently describes Elasticsearch as backend cluster software that client applications connect to via API calls. Any interface a user sees when interacting with an Elasticsearch-based application is built and supplied by a separate client application, not by Elasticsearch. Claim 28 specifically requires the interactive interface to be supplied by the search service itself—not constructed by a separate application that happens to query the search service. Because Elasticsearch supplies only query responses, not the interactive interface, this limitation is absent regardless of what interface a third-party application may independently provide.

88.      Elasticsearch also does not perform the iterative clarification loop Claim 28 requires. The claim requires the search service to supply an interactive interface that iteratively collects input to refine a search purpose, requests and receives a first clarification from the user, sends that clarification to the search service, and then in response requests and receives a second clarification. This describes a stateful, multi-turn conversational dialog maintained between the client and the search service across multiple exchanges. Elasticsearch is a fundamentally stateless system—each REST API request is independent, and Elasticsearch maintains no conversational context between requests. Elasticsearch provides direct query responses to discrete API calls; it does not drive or supply the claimed iterative clarification loop with first and second clarification

28

exchanges, and any apparent stateful behavior in an Elasticsearch-based application is implemented by the separate client application layer, not by Elasticsearch.

89.    Additionally, the 287 patent's specification and abstract describe a search service that acts as an intermediary—one that develops search criteria from the user's iterative input and then submits those criteria to downstream standard search engines accessible through the network. Elasticsearch does not function as this type of intermediary. Elasticsearch is itself the search engine; it does not sit upstream of other search engines, develop search criteria from iterative user dialog, or submit queries to downstream search services. This architectural mismatch independently defeats any theory that Elasticsearch constitutes the claimed search service.

90.    At least because of the absence of the "display hardware" supplied by the search service, the iterative clarification loop, and the intermediary search service architecture as discussed above, ALDI does not directly infringe the 287 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 287 patent, including no induced or contributory infringement of the 287 patent.

91.    Absent a declaratory judgment, IV will continue to wrongfully allege that ALDI infringes the 287 patent.

92.    An actual, substantial, immediate, and continuing controversy exists regarding the 287 patent; ALDI seeks a declaration of non-infringement.

**COUNT VI: DECLARATION OF NON-INFRINGEMENT
OF U.S. PATENT NO. 9,948,712 (Docker Swarm)**

93.    ALDI incorporates by reference the allegations in the paragraphs above as if fully set forth herein.

29

94.     The 712 patent (attached as Exhibit I) is titled "System and Method for Migrating an Agent Server to an Agent Client Device." The patent claims a mandatory, sequential migration protocol written from the perspective of the agent client device—the device designated to receive the migrating server—which must receive a participation request from the departing agent server, evaluate its own capability to host the migrating server, transmit a participation response, process an activation request containing agent server migration data transferred from the departing server, activate the agent server using that migration data, confirm successful activation, and terminate its own agent client function upon successful activation of the agent server.

95.     IV's March 20, 2026 letter to ALDI identifies Docker Swarm as the accused third-party platform for the 712 patent, with Claim 16 identified as the "example claim."

96.     ALDI has not infringed and does not infringe, under any theory of infringement (including directly (whether individually or jointly), indirectly (whether contributorily or by inducement), and/or under the doctrine of equivalents), any claim of the 712 patent, including through any making, use, offering to sell, selling, and/or encouraging the making, using, selling, offering to sell, and/or importation of Docker Swarm, at least because Docker Swarm does not employ, incorporate, use, or otherwise include all of the limitations of the 712 patent's claims. ALDI does not design, make, sell, offer to sell, or import Docker Swarm; IV's theories necessarily rest on ALDI's alleged "use" of third-party open-source software that ALDI did not create. IV's March 2026 letter identifies Claim 16 as the "example claim" for the 712 patent. Although there are additional reasons why ALDI and Docker Swarm do not infringe the 712 patent, non-limiting examples are discussed below.

97.     Claim 16 of the 712 patent recites: "A method, comprising: receiving, at an agent client device, an agent server participation request from an agent server device; determining, at the

30

agent client device, whether the agent client device is able to host an agent server to be migrated from the agent server device; transmitting an agent server participation response from the agent client device to the agent server device in response to determining that the agent client device is able to host the agent server; processing at the agent client device, an agent server activation request including agent server migration data, the agent server activation request received from the agent server device; activating the agent server on the agent client device using the agent server migration data from the agent server activation request; transmitting an agent server success response to indicate successful activation of the agent server on the agent client device, the agent server success response transmitted to the agent server device in response to the agent server activation request; and terminating an agent client executing on the agent client device in response to the server activation request and after the successful activation of the agent server on the agent client device."

98.    Docker Swarm's architecture is fundamentally incompatible with the claimed migration protocol at every step. Claim 16's sequential protocol rests on a foundational architectural assumption: that one device holds a unique, concentrated agent server instance—including state data that must be transferred as "agent server migration data"—requiring migration to a successor device through a coordinated request/response protocol before the originating device departs. Docker Swarm eliminates that assumption entirely through its Raft Consensus Algorithm, under which every manager node holds complete, identical cluster state at all times. Because every manager already possesses complete state, there is no unique agent server instance on any individual manager node requiring migration and no "agent server migration data" to transfer from a departing manager to a successor. The claimed migration protocol has no occasion to occur in

31

Docker Swarm because the architectural condition that necessitates it—a unique concentrated server instance requiring transfer—does not exist.

99.   One or more additional limitations of Claim 16 are independently absent. Claim 16 requires the agent client device to "determin[e] ... whether the agent client device is able to host an agent server to be migrated"—an affirmative capability evaluation that gates the participation response. Docker Swarm has no such capability determination step. When a node joins a Swarm cluster or is promoted to manager, no process evaluates whether the node is capable of hosting a migrating agent server—the join token mechanism is a credential check for cluster membership, not a capability evaluation for receiving migrated server state. Claim 16 also requires receiving a targeted participation request from the departing agent server device—a solicitation directed at a specific candidate successor. In Docker Swarm, nodes join by self-initiating contact with the manager using a pre-issued join token, and worker promotion is an administrative command issued externally; the manager never identifies, selects, or solicits a specific node to receive migrated state, and no participation request of any kind is transmitted by the departing manager to a selected successor. Claim 16 further requires processing an activation request that includes "agent server migration data" transferred from the departing agent server—specific state data enabling the agent client to activate the agent server using that data. Because Docker Swarm's Raft model keeps all managers in complete continuous synchronization, no migration data exists to transfer and no activation request containing such data is transmitted or processed. Finally, Claim 16 requires terminating the agent client executing on the agent client device after successful activation of the agent server—the receiving device must stop functioning as a client upon becoming a server. Docker Swarm manager nodes simultaneously function as both managers and workers by default; both roles coexist on the same node, and Docker Swarm's architecture affirmatively maintains

32

concurrent operation of both roles rather than terminating one upon activation of the other. These and other missing limitations each independently defeat any theory of infringement.

100.    At least because Docker Swarm lacks the targeted participation request, the capability determination, the agent server migration data, and the termination of the agent client upon activation—and because the sequential mandatory migration protocol Claim 16 requires has no occasion to occur in Docker Swarm's distributed consensus architecture—ALDI does not directly infringe the 712 patent, either literally or under the doctrine of equivalents. Likewise, at least because there is no direct infringement, ALDI does not indirectly infringe the 712 patent, including no induced or contributory infringement of the 712 patent.

101.    Absent a declaratory judgment, IV will continue to wrongfully allege that ALDI infringes the 712 patent.

102.    An actual, substantial, immediate, and continuing controversy exists regarding the 712 patent; ALDI seeks a declaration of non-infringement.

## PRAYER FOR RELIEF

103.    WHEREFORE, ALDI respectfully requests the following relief:

a.   A declaratory judgment in favor of ALDI and against IV on ALDI's claims;

b.   A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 844 Patent;

c.   A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 584 Patent;

d.   A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 582 Patent;

e.  A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 894 Patent;

f.  A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 287 Patent;

g.  A declaration that ALDI does not and did not infringe, directly or indirectly, literally or under the doctrine of equivalents, any claim of the 712 Patent;

h.  An order enjoining IV, and those acting in concert with or in privity with IV, from asserting, threatening to assert, or otherwise communicating infringement allegations under the 844, 584, 582, 894, 287, and 712 Patents against ALDI, ALDI's affiliates and subsidiaries, and ALDI's representatives, agents, vendors, partners, and customers, including by issuing "no authorization" letters or similar communications to ALDI's vendors, partners, or customers regarding the DJ Patents;

i.  A finding this is an exceptional case under 35 U.S.C. § 285;

j.  An order awarding attorney fees, expenses of litigation, and costs to ALDI; and

k.  Such other and further relief as the Court deems just and proper.

**DEMAND FOR A JURY TRIAL**

104.    ALDI demands a jury trial on all issues and claims so triable.

OF COUNSEL:

Michael C. Wilson
S. Wallace Dunwoody
Lucas R. Dombroski
Munck Wilson Mandala, LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201
(972) 628-3600
mwilson@munckwilson.com
wdunwoody@munckwilson.com
ldombroski@munckwilson.com

April 21, 2026

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

_____

Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff, ALDI Inc.*